UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

BRIAN IRIZARRY                    :
                                  :
                                  :
v.                                :     CIV. NO. 3:15CV01400(HBF)
                                  :
MICHAEL DOWLING,                  :
ANDREW RONDEAU,                   :
HEATH ERICSON, and                :
ETHAN TANKSLEY                    :
                                  :

BENCH RULING

Plaintiff Brian Irizarry brings this civil rights action
against officers of the Connecticut State Police pursuant to 42
U.S.C. §1983, claiming excessive force and deliberate
indifference to serious medical needs in violation of his Fourth
Amendment rights under the United States Constitution.
Defendants are Troopers Michael Dowling, Andrew Rondeau and
Ethan Tanksley and Sergeant Heath Ericson.[1] Defendants are sued
in their individual capacity. A bench trial was held on July 10
and 11, 2018.

Testimony and evidence adduced at the trial are summarized
below as necessary to explain the Court's findings and
conclusions.

---

[1] Plaintiff alleges excessive force against all defendants.
[Compl. ¶¶7-9, 11]. Plaintiff brings the deliberate indifference
to serious medical needs claim only against defendant Ericson.
[Compl. ¶¶10, 12; Doc. #26 at ¶6, ¶13(6); Doc. #37 ¶6].

## I.  FINDINGS OF FACT

Based on the credible testimony, the exhibits, and the entire record developed during the trial, the Court finds the following facts established.

1. At all times relevant to this lawsuit, the defendants were acting in their official capacity as Connecticut State Troopers and therefore under color of state law.

2. Plaintiff Brian Irizarry is currently serving a state sentence for various crimes including assault on a police officer, creating a public disturbance and reckless endangerment, all arising on May 12, 2013 out of the incidents alleged in this lawsuit. [7/10/18 Tr. 8-9].

3. In May 2013, plaintiff Brian Irizarry was released on bond with a promise to appear on various state larceny and robbery charges. [7/10/18 Tr. 13]. On May 12, 2013, there were several outstanding warrants for failure to appear, with a total bond amount of $450,000. [Def. Ex. 501, 7/10/18 Tr. at 121].

## Failure to Appear

4. Michael Malley is a Bail Enforcement Agent. Prior to May 12, 2013, he posted bond for Irizarry after an arrest. [7/10/18 Tr. 75]. Sometime thereafter, Malley learned that plaintiff did not attend his sentencing and the bond was forfeited by the court for Irizarry's failure to appear.

<u>Id.</u> Malley testified that he had six months to locate Irizarry or he would be responsible for paying the full amount on the bond. [7/10/18 Tr. 75-76].

5. Malley explained that he reviewed Irizarry's bond application and reached out to his family and listed contacts, did field investigations and used other investigative measures in an effort to apprehend plaintiff. [7/10/18 Tr. 76]. Malley was aware that Irizarry was wanted on approximately six warrants. <u>Id.</u>

6. Malley learned from these inquiries that Irizarry was

   on the run and that he apparently made statements that he was not going to be caught, and they were kind of worried, his friends, the people who reached out to us, were worried for his safety being apprehended. They said he had a very, very fast car and he would try to flee. That was the impression that they gave us is that he does not want to be taken into custody.

   [7/10/18 Tr. 77].

7. Malley was informed that plaintiff was carrying pepper spray. <u>Id.</u>

<u>Dunkin' Donuts</u>

8. Malley received information that Irizarry was going to be in Brooklyn, Connecticut, and was spending time at the Dunkin' Donuts. [7/10/18 Tr. 78-79]. He drove with Mark Vanaman, another Bail Enforcement Agent, to the Dunkin' Donuts where they eventually identified plaintiff inside the building and saw his car in the

parking lot. [7/10/18 Tr. 79]. Malley contacted the
State Police to report that Irizarry was located. Id.

9. At 6:57 PM on May 12, 2013, Connecticut State Trooper
Michael Dowling was dispatched by Troop D to assist Malley
and Vanaman with taking plaintiff into custody. [Def. Ex.
501, 7/10/18 Tr. 120].

10.     Trooper Dowling met Malley and Vanaman in a
parking lot located near the Brooklyn Dunkin' Donuts.
The Agents presented identification and badges and
showed Trooper Dowling a photograph of Brian Irizarry.
[7/10/18 Tr. at 121]. It was arranged that Agent
Vanaman would walk to the Dunkin' Donuts and enter
through the front entrance. Malley and Dowling drove
their cars to the Dunkin' Donuts. Malley planned to
enter through the west side entrance and Trooper
Dowling would enter on the north side through the
front door. [7/10/18 Tr. 82, 103, 122]. There were
vehicles at both exits. Malley and Vanaman testified
that they believed it would be safer to apprehend
Irizarry in a confined setting, such as the Dunkin'
Donuts, rather than when plaintiff was in his car.
They assessed that a potential car chase should be
avoided. [7/10/18 Tr. 91, 113, 122].

11.    Malley testified that as he pulled the car up to the west entrance, he observed Vanaman struggling with Irizarry inside and "people running all over the place. As soon as I entered, I was hit by a cloud of pepper spray." [7/10/18 Tr. 83]. Malley stated that his eyes were tearing, he had difficulty breathing and he started to cough. [7/10/18 Tr. 84].

12.    Trooper Dowling testified that as he pulled up to the front of the building, he observed "two females, who were seated near that window, jump up and run from the right to the left to the east side of the restaurant." [Tr. 7/10/18 Tr. 123]. As he entered through the front door, Trooper Dowling observed a reddish-orange substance on Vanaman that he recognized from his training and experience to be pepper spray, also known as OC ("oleoresin capsicum") spray. He testified that Vanaman was fighting with Irizarry, who had shed his shirt. [7/10/18 Tr. 124].

13.    As he entered the restaurant, Trooper Dowling immediately felt the effects of pepper spray- including burning in his lungs and skin and changes to his breathing and vision. [7/10/18 Tr. 125].

14.    Irizarry ran across the restaurant toward the register. Trooper Dowling testified that plaintiff

ignored repeated verbal commands to stop and submit to
arrest. [7/10/18 Tr. 126-27]. "My understanding is
that he was just trying to do anything he could do get
away." [7/10/18 Tr. 127].

15.    Closed circuit video footage recorded inside the
Dunkin' Donuts from four locations captured the following:

- Agent Vanaman entered Dunkin' Donuts through the front
  door and walked past plaintiff, who was seated at a
  corner table. Out of plaintiff's sight, Agent Vanaman
  removed his glasses and pulled out his badge that was
  hanging from a chain round his neck to display it on
  his chest.

- When Vanaman approached plaintiff at his table,
  plaintiff initiated a physical struggle. The video
  shows Agent Vanaman holding plaintiff by his shirt and
  plaintiff escaping his grasp by discharging pepper
  spray and slipping from his jacket and shirt and
  running toward the service counter. Customers and
  employees are seen running away from plaintiff and
  covering their mouths and eyes. Agent Vanaman doubled
  over covering his eyes. Plaintiff collided with
  customers as he reached the counter on the other/east
  side of the Dunkin' Donuts.

- As plaintiff and Agent Vanaman engaged in a physical struggle, Agent Malley entered Dunkin' Donuts through the west entrance. Shortly thereafter, Trooper Dowling entered through the front entrance.

- Trooper Dowling attempted to stop plaintiff at the counter by holding his pants but was unable to keep his grip. Irizarry jumped over the counter, then ran a short distance to the drive-through window. Irizarry dove head-first through the drive-through window and ran to the right.

- Trooper Dowling exited the Dunkin Donuts through the front door. He was next seen running by the drive-through window after Irizarry.

[Def. Ex. 503].

16.    Vanaman testified that when he approached Irizarry he had his badge displayed and stated "bail enforcement, you have a warrant, put your hands up." [7/10/18 Tr. 105-07]. As Irizarry reached into his pocket, Vanaman approached him and began to physically struggle with him to prevent plaintiff from reaching whatever was in his pocket. Id. Irizarry sprayed pepper spray directly into Vanaman's eyes, blinding him. [7/10/18 Tr. 107]. Irizarry pulled away and slipped out of his shirt and jacket and ran. Id.

17.    At trial, plaintiff did not dispute that he was aware
       there were outstanding warrants issued for his arrest; he
       admitted that he failed to comply with verbal commands from
       Agents Vanaman and Malley or Trooper Dowling to submit to
       their custody; he purposely carried pepper spray to evade
       arrest; he discharged pepper spray at Agent Vanaman; he saw
       Trooper Dowling enter the Dunkin' Donuts through the front
       door and ran in the opposite direction so he would not be
       arrested; he physically struggled with Vanaman, Malley and
       Trooper Dowling; he ran into customers who blocked his path
       to jump over the counter; and he escaped from Dunkin'
       Donuts by diving out of the drive-through window in an
       effort to evade being taken into custody. [7/10/18 Tr. 45-
       57].

18.    Vanaman, Malley and Trooper Dowling testified
       that they issued numerous commands to plaintiff to
       submit to arrest that he ignored. [7/10/18 Tr. 84, 86,
       110, 126].

19.    Once outside the Dunkin' Donuts, Trooper Dowling
       testified that he called for police backup,
       identifying Irizarry as wearing black pants and no
       shirt. [7/10/18 Tr. 130; Def. Ex. 501]. Plaintiff was
       running "at a dead sprint." [7/10/18 Tr. at 131].

Dowling testified that he was concerned for his
safety.

> I had already felt the effects of the pepper spray; I
> had clearly identified myself as a state trooper; I
> told him he was under arrest, and he was still fleeing
> from me. I had used physical force. I grabbed onto him
> and he still pulled away and resisted my commands to
> stop resisting.

[7/10/18 Tr. at 131].

Foot Pursuit and Arrest

20.     The undisputed testimony is that Trooper Dowling
chased Irizarry from the Dunkin' Donuts down Allen
Hill Road, through a yard and into nearby woods.
Trooper Dowling testified that he continued to order
Irizarry to stop and submit to arrest as he gave
chase. [7/10/18 Tr. 57-58; 77, 132].

21.     Before entering the woods, Trooper Dowling warned
Irizarry to stop or he would use his Taser. Plaintiff did
not comply. The Taser was deployed but did not reach
plaintiff. A second effort resulted in a malfunction of the
device. [7/10/18 Tr. 132-34].

22.     Trooper Dowling continued to order Irizarry to stop
and submit to arrest. Id. Dowling radioed to dispatch that
Irizarry was running into the woods at number 60 Allen Hill
Road. [7/10/18 Tr. 137-38; Def. Ex. 501].

23.    Malley testified that he ran after Irizarry but could
    not breathe from the effects from exposure to the pepper
    spray and turned back to the Dunkin' Donuts to assist
    Vanaman. At that point, he heard sirens, observed the
    arrival of state police cruisers and saw troopers enter the
    woods. [7/10/18 Tr. 87-88].

24.    Trooper Dowling testified that upon entering the
    woods, Irizarry slowed to a fast walk. Dowling yelled
    "stop, State Police." [7/10/18 Tr. 138]. Irizarry continued
    to run. Dowling caught up with plaintiff and tackled him to
    the ground. [7/10/18 Tr. 139]. Plaintiff would not submit
    to arrest. Plaintiff continued to resist, struggling,
    flailing his arms and rolling on the ground. Trooper
    Dowling attempted multiple compliance holds without
    success. [7/10/18 Tr. 140-41]. Irizarry initially appeared
    to become compliant; however, when Dowling "attempted to
    handcuff him, he continued to pull his arms away and
    continued to attempt to escape." [7/10/18 Tr. 141]. During
    a second attempt to handcuff plaintiff, Dowling lost
    control of his handcuffs. Irizarry "was flailing his arms,
    he rolled around on his stomach, so I was basically in a
    full mount position on him at that point." Id. Trooper
    Dowling testified that Irizarry was flailing his arms and
    attempting to strike him in the head. [7/10/18 Tr. 143].

25.    Trooper Dowling estimates that he struck plaintiff
approximately ten times to control him sufficiently to
place him in handcuffs. [7/10/18 Tr. 143, 145]. At some
point, Dowling was thrown from his position on top of
Irizarry and landed on his [Dowling's] back. [7/10/18 Tr.
144].

26.    Trooper Dowling testified he was exhausted and aware
he had broken his right hand during the struggle and
efforts to take plaintiff into custody. [7/10/18 Tr. 145].

27.    Troopers Rondeau and Tanksley and Sergeant Ericson
testified that they responded to Dowling's call for back up
support. [7/10/18 Tr. 174-75; 200-201; 234]. When Trooper
Rondeau arrived at Allen Hill Road, he could not see
Dowling and Irizarry in the woods but he could "hear an
active ongoing struggle, screaming, yelling, sticks
breaking. It was obvious there was a fight happening."
[7/10/18 Tr. 177] He ran into the woods toward the sounds,
with Trooper Tanksley following Rondeau. [7/10/18 Tr. 177-
78; 203].

28.    Troopers Rondeau and Tanksley testified that they
found Trooper Dowling on his back with a hand raised in a
defensive position. Irizarry was kneeling on top of Trooper
Dowling with his hand raised with a clenched fist as if
about to strike Trooper Dowling. [7/10/18 Tr. 178-79; 204-

05]. Trooper Tanksley testified that Dowling "was in a vulnerable position because he was on his back" and it did not appear that Dowling was in control of the situation. [7/10/18 Tr. 205; see also Tr. 179].

29.     Dowling testified that once Troopers Rondeau and Tanksley arrived on the scene, Irizarry was tackled and placed on the ground. [7/10/18 Tr. 146]. Irizarry continued to struggle and attempt to flee. [7/10/18 Tr. 146-47; 180-81; 206].

30.     Sergeant Ericson followed Troopers Tanksley and Rondeau into the woods. When he arrived on the scene they were involved in an altercation with plaintiff. [7/10/18 Tr. 236, 238]. He testified that after speaking with Dowling and checking on his condition, Ericson observed Irizarry swinging his fists, kicking his legs and struggling to get free of Rondeau and Tanksley. [7/10/18 Tr. 238-39]. Ericson stated that he witnessed Trooper Tanksley hit plaintiff approximately four times and Trooper Rondeau hit Irizarry approximately six times without subduing him. [7/10/18 Tr. 239-40].

31.     Trooper Rondeau testified that he hit Irizarry several times to the head to "gain pain compliance from him because he would not stop fighting." [7/10/18 Tr. 182-83].

32.    Trooper Tanksley testified that he hit plaintiff with
his fists two or three times and with an elbow
approximately three to four times without any effect. "I
was trying to gain control and end the altercation as
quickly as possible." [7/10/18 Tr. 208-09].Eventually,
plaintiff "just became more tired than we did and couldn't
fight anymore." [7/10/18 Tr. 209].

33.    Later that evening around 10:00 PM, Trooper Tanksley
was treated for a sprained left wrist. He was transported
to the hospital by Trooper Brink.

34.    Troopers Rondeau and Tanksley testified that plaintiff
was bleeding from the face before they hit him. [7/10/18
Tr. 180, 208].

35.    Soon after the arrival of Troopers Rondeau and
Tanksley, Trooper Dowling observed Sergeant Ericson on the
scene. Thereafter, Dowling played no further role in
Irizarry's apprehension. [7/10/18 Tr. 147-48; 184-85].

36.    Together, Troopers Rondeau and Tanksley were able to
subdue and handcuff Irizarry. [7/10/18 Tr. 149; 209].
Rondeau and Tanksley estimated that the struggle to take
plaintiff into custody lasted approximately a minute or
two. [7/10/18 Tr. 183, 208].

37.    Trooper Dowling was escorted out of the woods by
Trooper Brink. Trooper Brink assisted Dowling with removing

his shirt, duty belt and gear and putting it in the back of the cruiser and accompanied him to the hospital. Trooper Dowling was transported by ambulance to the hospital, where he was treated for a fractured hand. [7/10/18 Tr. 149-150; 7/11/18 Tr. 5-6].

38.   At all times after Trooper Dowling tackled plaintiff, Irizarry continued to resist, flailed his arms and legs, ignored verbal commands to stop and did not comply with efforts to place his hands in cuffs. [7/10/18 Tr. 139-40, 143, 145].

39.   Similarly, Troopers Dowling, Rondeau and Tanksley and Sergeant Ericson testified that plaintiff ignored verbal commands to stop resisting, struggled and flailed his arms to evade being taken into custody. [7/10/18 Tr. 147-49; 180-82; 185; 206-09, 211; 239-40].

40.   Troopers Rondeau, Tanksley and Ericson testified that after Irizarry was placed in handcuffs, no further force was used on plaintiff. [7/10/18 Tr. 184; 209; 246]. Rondeau testified that "[o]nce [plaintiff] was handcuffed, we sat him up, let him catch his breath, and within maybe a minute we walked him out of the woods." [7/10/18 Tr. 184, 210].

41.   Dispatch records from the Connecticut State Police state:

- "Out with Bond Agent Mark Vanaman ... Picking up
  Irizarry who is a file 5 out of Clinton, CT" at
  18:58.

- "669 [Dowling] requesting additional units" at 18:59.[2]

- "669 [Dowling] no shirt black pants" at 19:01.

- "669 [Dowling] out in woods with subject on the
  ground" at 19:02.

- "Next to 60 Allen Hill [Road]" at 19:02.

-  "1 in custody" at 19:05.

- "231 [Ericson] requesting services on Allen Hill
  Road" at 19:06.

- "1274 [Vivino] to Dunkin' Donuts for statements" at
  19:10.

- "Services 31" at 19:19.

- "669 [Dowling] Enroute to DK [Day Kimball Hospital] via
  Mortlake [Ambulance]. 709 [Brink] Following. 669's
  [Dowling's] gear secured by 709 [Brink]" at 19:27.

[Def. Ex. 501].

---

[2] Trooper Dowling is identified by his badge number "669" in the
incident reports. [Def. Ex. 501]. Trooper Tanksley is badge
number "980"; Trooper Rondeau is badge number "393"; Sergeant
Ericson is badge number "231"; Trooper Vivino is badge number
"1274" and Trooper Brink is badge number "709." Id.

42.     After apprehending Irizarry, Trooper Rondeau was sent
        to the Dunkin' Donuts. [7/10/18 Tr. 186]. Sergeant Ericson
        assigned Trooper Tanksley to transport plaintiff to the
        barracks. [7/10/18 Tr. 211-212].

43.     Tanksley testified that he "escorted [Irizarry] out of
        the wood line, transported him to the barracks, escorted
        him to a holding cell, made sure that an additional pat-
        down [was] conducted ...and placed him in a holding cell."
        [7/10/18 Tr. 212]. The handcuffs were removed. Tanksley
        stated that plaintiff was compliant throughout this
        process. [7/10/18 Tr. 214, 216-17].

44.     At no time during this process did plaintiff request
        medical attention. Tanksley testified that Irizarry had
        dried blood on his face, was conscious and breathing
        normally. [7/10/18 Tr. 216-18]. Tanksley did not see
        plaintiff after he was placed in the holding cell. [7/10/18
        Tr. 218].

45.     Once plaintiff was placed in a holding cell, Tanksley
        returned to Dunkin' Donuts to assist Sergeant Ericson and
        other troopers with the investigation and taking witness
        statements. [7/10/18 Tr. 215-16].

46.     Sergeant Ericson testified that once Irizarry was
        handcuffed, he could see that plaintiff was bleeding from a

laceration to his forehead. [7/10/18 Tr. 241]. Ericson

testified that

Mr. Irizarry was not in need of immediate medical
attention. He had a laceration on his face that was
not bleeding profusely. He was breathing properly. He
was not in cardiac arrest or any kind of breathing
difficulty. He did not sustain a loss of blood. So he
was not in dire need of medical attention. At that
point he was transported back to the barracks until I
[had] the personnel required to bring him to the
hospital.
...

[W]e had seven people on patrol including the desk
person. So we have six people on patrol of the
fourteen town area. Effectively after this incident,
Trooper Dowling had to go to the hospital. You always
have to send a support trooper with that trooper,
which is Trooper Brink, therefore, I'm down [two
other] personnel, which is Trooper Rondeau with blood
exposure on his uniform, and he had to change prior to
going to the other calls. I also had to send the
remaining troopers, most of them,...back up to Dunkin'
Donuts to take the statements, photographs, and seize
evidence.

[7/11/18 Tr. 13-14].

The Investigation

47.    After plaintiff was taken into custody, Sergeant

Ericson, as shift supervisor, was responsible for

investigating the incidents. He explained that this was not

only a use of force incident, but also an OSHA

(Occupational Safety and Health Administration) incident,

because two troopers were injured on duty, and a criminal

investigation. There were multiple incident locations and

multiple people with medical issues arising from exposure
to pepper spray and use of force. [7/10/18 Tr. 242, 255].

48.     Sergeant Ericson explained that this incident strained
his available resources for the shift. He testified that

At that point there was a lot going on, so I have to
break it down and try to figure out what needs to be
done, who can do it at that point, because at that
point Trooper Dowling had to go to the hospital. And
Trooper Brink, who is actually another patrol trooper
had to go with him that day.
...

So effectively with my six personnel on scene or even
in the fourteen town area, I am now effectively down
to three. And with those three, we have to take
statements from the witnesses up at the Dunkin'
Donuts. We have to render aid up there because they
all got sprayed with capsicum. We have to take
photographs, we have to seize evidence, so there's a
lot going on.

[7/10/18 Tr. 242].

49.     Ericson stated that although Trooper Tanksley
injured his hand, he could not go to the hospital
because they did not have enough personnel. After
dropping off Irizarry at the barracks Tanksley was
reassigned to the Dunkin' Donuts to take the initial
incident report of the criminal matter. Ericson called
the barracks to order two or three troopers from the
midnight shift to supplement the evening shift to
cover for lost personnel. [7/10/18 Tr. 246-48].
Trooper Rondeau was assigned to the Dunkin' Donuts to

take photographs of the scene or some other detail.
[7/10/18 Tr. 250].

50.    With regard to the use of force incident report,
Sergeant Ericson testified that the whole incident had to
be investigated to try determine what happened with
plaintiff's injuries. [7/10/18 Tr. 243]. Irizarry's "injury
could have been sustained jumping out of the drive-thru
window, his injury could have been sustained with the
altercation with Trooper Dowling, ... [or] Trooper Rondeau
and Trooper Tanksley. So that point it's — I really can't
determine how his injuries were sustained." Id.

51.    Ericson's use of force incident reports received
multiple levels of review. Ericson's report was submitted
to the barracks' Lieutenant, Scott Smith, and then
submitted to Internal Affairs for review. [7/10/18 Tr.
244].

52.    Sergeant Ericson testified that,

My conclusion is that the use of force was justified.
They used the minimum amount of force applicable to
effect the arrest of the dangerous fleeing felon. They
used – the first was their presence. Trooper Dowling
has his uniform on. That did not stop Mr. Irizarry. He
used verbal commands, that did not stop Mr. Irizarry.
He tried to utilize his Taser, that did not stop Mr.
Irizarry. He tried using, at that point, all three
tried to use an open and closed hand technique to
strike him to apprehend him, and eventually taken into
custody because of that and I believe he was just
exhausted.

[7/10/18 Tr. 244-45].

53.    Ericson explained that open hand strikes, closed hand
       strikes and elbow strikes are techniques taught to troopers
       during use of force training and defensive techniques
       training at the academy and annual in-service training.
       "The goal is to gain compliance of the subject...so he will
       not either strike you or he will also give up and stop
       fighting against basically the arrest is affected which is
       kind of better for the troopers and the individuals and the
       arrestee." [7/10/18 Tr. 245-46].

54.    Sergeant Ericson testified that after Irizarry
       complied with the arrest, none of the troopers struck him.
       [7/10/18 Tr. 246].

55.    When Ericson returned to the barracks approximately
       two and a half hours later, he checked in with dispatch and
       was updated on the other calls that were pending. [7/10/18
       Tr. 248, 251; 7/11/18 Tr. 15]. He testified that barracks,
       personnel were directed to process Irizarry as soon as
       personnel were available. When he returned to the barracks
       Irizarry's processing had just been completed by Trooper
       Forbes, who was assigned to the midnight shift. He "took a
       long time to be processed because [Irizarry] had nine bond
       warrants at $450,000. So he had nine rearrest warrants,

plus he had the criminal case that we had against him that day." [7/10/18 Tr. 248-49].

56.    The $450,000 bond was the aggregate of all nine warrants. In addition, Ericson placed a $100,000 bond on Irizarry for the May 12, 2013 incident because he assessed that plaintiff was a danger to the public and an immediate flight risk. [7/10/18 Tr. 249].

57.    Ericson visited Irizarry in the holding cell. Irizarry was sitting up and conscious; he had a laceration to his face. Ericson asked him if he needed medical attention and Irizarry either said "yes" or nodded his head. At that point, an ambulance was called and plaintiff was transported to the Day Kimball Hospital by Trooper [Vi]vino-Taft. This was Ericson's first opportunity to see plaintiff after he was transported from the woods. [7/10/18 Tr. 251-52; 7/11/18 Tr. 16].

58.    Sergeant Ericson stated that there is a sign posted in the cell block that states that if a prisoner is in need of medical attention, they should contact a trooper or supervisor. [7/11/18 Tr. 16]. Additionally, prisoners are monitored by video and audio by the trooper at the dispatch desk. [7/11/18 Tr. 16-17]. Ericson stated that he was not notified by dispatch that Irizarry requested medical attention. [7/11/18 Tr. 17].

59.    Ambulance service for the towns surrounding Troop D is

provided by two volunteer companies. After Irizarry's

arrest, one ambulance transported Trooper Dowling to the

hospital and the second ambulance responded to the Dunkin'

Donuts to decontaminate people exposed to pepper spray.

[7/10/18 Tr. 252; 7/11/18 Tr. 12]. Transport of Trooper

Dowling and, later that evening, Trooper Tanksley and

Irizarry, required additional assignment of troopers to

accompany the ambulances. [7/10/18 Tr. 252; 7/11/18 Tr.

12].

60.    Ericson testified that there were numerous

investigations to process from the incidents that day.

There was the use of force investigation arising out of the

arrest of Irizarry. Second, an OSHA report was required

because of the injuries sustained by Troopers Dowling and

Tanksley. Finally, there was the criminal investigation

arising out of the incident at the Dunkin' Donuts and use

of pepper spray on Agent Vanaman. Information gathering

included photographs, documenting seized evidence, a

download of the closed circuit video from Dunkin' Donuts, a

Taser Download Report, CAD summary report from dispatch,

reports from the Troopers and witness statements from Bail

Enforcement Agents Vanaman and Malley and employees and

patrons of the Dunkin' Donuts. [7/10/18 Tr. 254-62].

61.   Ericson explained that these investigations overlapped. The use of force incident began when Trooper Dowling entered the Dunkin' Donuts and continued to when Irizarry was taken into custody and processed. The criminal investigation began at the Dunkin' Donuts when Irizarry tried to flee arrest and used pepper spray on Bail Enforcement Agent Vanaman. Similarly, the OSHA incident began with Trooper Dowling's exposure to the cloud of pepper spray upon entering the Dunkin' Donuts. [7/10/18 Tr. 256-83]. All these facts, the witness statements, trooper reports, the surveillance video from the Dunkin' Donuts, electronic dispatch report, Taser deployment report, criminal case report, seized evidence, and photographs were considered by Ericson in his investigation of the use of force. Id.; Def. Ex. 501, 502, 504 (B-F), 505, 509, 510.

62.   Sergeant Ericson photographed Irizarry's hands after the incident and testified that the injuries were "consistent with a struggle or striking or punching." [7/10/18 Tr. 272-73, 277; Def. Ex. 504 (B-F), 510]. Photographs of Trooper Dowling's hands also show injuries consistent with a struggle. [7/10/18 Tr. 273; Def. Ex. 509]. Similarly, Sergeant Ericson testified that photographs of Trooper Tanksley's uniform, right elbow and

hands show injuries consistent with striking Irizarry and a

struggle. [7/10/18 Tr. 273-76, 278; Def. Ex. 505].

II.  CLAIMS ARISING UNDER 42 U.S.C. §1983

To prevail on a claim under Section 1983, a plaintiff

must show: (1) the deprivation of any rights, privileges, or

immunities secured by the United States Constitution and its

laws; (2) by a person acting under color of state law. 42

U.S.C. 1983. "Section 1983 itself creates no substantive

rights; it provides only a procedure for redress for the

deprivation of rights established elsewhere." Sykes v. James,

13 F.3d 515, 519 (2d Cir. 1993).There is no dispute that

defendants were acting under color of state law. The question

presented, therefore, is whether defendants' alleged conduct

deprived Irizarry of his Fourth Amendment rights. Thus, the

Court need only address whether plaintiff Irizarry has shown

by the preponderance of the evidence that he was deprived of a

constitutional right.

Plaintiff contends that his Fourth Amendment rights to

the United States Constitution were violated when (1)

defendants used excessive force in the course of his arrest;

and (2) defendant Ericson failed to promptly bring Irizarry to

the hospital after he was placed under arrest. [Compl. ¶7-¶12;

Doc. #26 ¶6].

III. <u>EXCESSIVE FORCE</u>

Plaintiff alleges that defendants Dowling, Rondeau and Tanksley subjected him to excessive force after he was in police custody and that their supervising officer, Sergeant Ericson, "stood in the immediate area watching and encouraging the beating" in violation of the Fourth Amendment to the United States Constitution. [Compl. ¶¶8-9].

Irizarry testified that after he was handcuffed, all four troopers took turns striking and kicking him. [7/10/18 Tr. 26]. Plaintiff testified that five to ten minutes elapsed from the time that Trooper Dowling began striking and punching him to the last blow from one of the defendants. <u>Id.</u>

Defendants Dowling, Rondeau, and Tanksley do not dispute that they tackled and/or struck plaintiff. Rather, they contend they used a reasonable amount of force to take plaintiff into custody. Sergeant Ericson denies striking plaintiff at all.

"The Fourth Amendment prohibits the use of excessive force in making an arrest, and whether the force used is excessive is to be analyzed under that Amendment's 'reasonableness standard.'" <u>Brown v. City of N.Y.</u>, 798 F.3d 94, 100 (2d Cir. 2015) (quoting <u>Graham v. Connor</u>, 490 U.S. 386, 395, 109 S. Ct. 1865, 104 L.Ed.2d 443 (1989)); <u>see</u> <u>also</u> <u>Tracy v. Freshwater</u>, 623 F.3d 90, 96 (2d Cir. 2010). "Determining excessiveness requires 'a careful balancing of the nature and quality of the intrusion

on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.' " Id. (quoting Graham, 490 U.S. at 396, 109 S. Ct. 1865).

When considering whether a particular use of force was reasonable, the Court considers at least three factors: "(1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." Tracy, 623 F.3d at 96 (citing Graham, 490 U.S. at 396, 109 S. Ct. 1865).

As summarized by the Second Circuit, in the Fourth Amendment setting, "the reasonableness question is whether the officers' actions were 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Mickle v. Morin, 297 F.3d 114, 120 (2d Cir. 2002) (quoting Graham, 490 U.S. at 397, 109 S. Ct. 1865). The Court must engage in an exclusively objective analysis of the reasonableness of the defendants' actions, merely assessing "whether the officers acted reasonably in light of the facts and circumstances of the situation they faced, without regard to their underlying motives or subjective intent toward the suspect." Anderson v. Branen, 17 F.3d 552, 559

(2d Cir. 1994) (citing Graham*,* 490 U.S. at 397, 109 S. Ct. 1872). The court is barred from considering subjective factors.

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham*,* 490 U.S. at 396, 109 S. Ct. 1865 (citing Terry v. Ohio*,* 392 U.S. 1, 20-22, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Id. at 396-97, 109 S. Ct. 1872. Accordingly, "[w]hether the force used in connection with the arrest is reasonable depends on a careful weighing of the totality of the circumstances in each particular case, including whether the suspect poses a threat, resists, or attempts to evade arrest, and the severity of the crime at issue." Felmine v. City of New York*,* No. 09-CV-3768 (CBA)(JO), 2011 WL 4543268, at *18 (E.D.N.Y. Sept. 29, 2011), reconsideration denied*,* No. 09 Civ. 3768, 2012 WL 1999863 (E.D.N.Y. June 4, 2012) (citing Graham, 490 U.S. at 396). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." Tracy, 623 F.3d at 96 (quoting Graham, 490 U.S. at 397, 109 S. Ct. 1865).

As to the first factor, the nature and severity of the crime leading to the arrest, it is undisputed that plaintiff had several outstanding warrants stemming from his failure to appear in court, with a total bond amount of $450,000. The Court credits the testimony from Bail Enforcement Agent Malley that in the course of trying to locate Irizarry, he learned that that plaintiff was aware there were outstanding warrants for his arrest, he was on the run and he was trying to evade arrest. Malley testified that he believed Irizarry would try to flee when confronted and this belief was reasonable based on the information collected by Malley.

As to the second factor, whether the suspect poses an immediate threat to the safety of the officer or others, it is undisputed that plaintiff physically struggled with Vanaman and used pepper spray to escape, ignored the commands of Vanaman, Malley and Trooper Dowling to submit to arrest, ran into customers, exposed everyone in the immediate area to the effects of pepper spray, physically struggled with Trooper Dowling and destroyed property in his efforts to flee Dunkin' Donuts.

Finally, it is uncontested that plaintiff was actively resisting arrest and attempting to evade arrest by flight. The Court credits the testimony of defendant Dowling that after jumping through the Dunkin' Donuts window, plaintiff continued to flee and ignore verbal commands. Once Irizarry entered the

woods, Dowling was able to stop his escape by tackling him.
Irizarry continued to struggle and failed to comply with
commands to permit the fastening of handcuffs. [7/10/18 Tr. 140,
143, 145]. Officers Tanksley, Rondeau and Ericson credibly
testified that plaintiff was aggressive and uncooperative; when
they entered the woods, plaintiff was in a serious altercation
with Trooper Dowling; plaintiff ignored their commands to stop,
and that it required physical intervention by two officers to
effectuate his arrest. [7/10/18 Tr. 147-49; 180-82; 185; 206-09,
211; 239-40]. Plaintiff did not dispute this testimony.

        Based on the time-stamped electronic dispatch records,
defendants were able to gain control of plaintiff and apply
handcuffs within a reasonable and brief time-frame. [Def. Ex.
501]. Trooper Dowling's initial call for backup came into
dispatch at 18:59PM. By 19:05 PM dispatch recorded that one
person was in custody. Id. By 19:10 PM dispatch further recorded
that that an officer or officers were sent to Dunkin' Donuts to
take witness statements. Id. The Court also credits defendants'
testimony that once plaintiff was placed in handcuffs, he was
escorted out of the woods and placed in a cruiser. Their
testimony is supported by the electronic dispatch records that
show that the elapsed time from Dowling's request for back-up to
defendants' taking plaintiff into custody was at most six
minutes. This time-frame included the foot chase from Dunkin'

Donuts into the woods, Dowling's two attempts to deploy his
Taser, Dowling's struggle in the woods with Irizarry and the
time necessary for Rondeau and Tanksley to take plaintiff into
custody, all of which is considerably shorter than the estimated
five to ten minute beating by defendants plaintiff alleges
occurred after he was placed in handcuffs. [Def. Ex. 501,
7/10/18 Tr. 26]. The evidence shows that plaintiff's injuries
are consistent with a scuffle of quick duration. The Court
concludes that the force used by defendants was reasonable and
necessary to subdue and take plaintiff in police custody.

The Court does not credit plaintiff's testimony that after
he was handcuffed, he was subjected to a sustained beating by
defendants. Plaintiff's testimony that the officers punched and
kicked him repeatedly to the face, ribs and body after he was in
handcuffs is not consistent with the medical evidence. EMS
records state that plaintiff was conscious and alert and all
motor and sensory neurological examination were normal. [Pl. Ex.
1]. Hospital records on admission describe plaintiff's symptoms
as "moderate." Id. He had a 3 cm laceration over his eyebrow and
a 4 cm laceration between his eyebrows. Id. A local anesthetic
was used for anesthesia; comfort measure/ice was applied and no
pain medication was provided. Id. Sixteen sutures were applied
at plaintiff's bedside. Id. No surgery was required. Examination
of plaintiff's abdomen noted no tenderness or bruises, masses or

injuries consistent with being "kicked in the face, punched in the face, the back, sides, legs, [and] from pretty much all directions." [7/10/18 Tr. 27, Pl. Ex. 1]. Plaintiff was conscious, exhibited no neurological deficits and had no injuries to his hair/scalp, eyes, nose, teeth, mouth, ribs or neck/throat. The only injury documented by EMS and hospital personnel was the lacerations to his face. [Pl. Ex. 1].

The evidence supports Sergeant Ericson's testimony that the use of force was reasonable and necessary under the circumstances to effect the arrest of Irizarry. First, the presence of a uniformed law enforcement officer did not deter plaintiff. Second, plaintiff did not comply with repeated verbal commands from law enforcement. Third, plaintiff did not stop fleeing when Trooper Dowling said he would use a Taser on him. Last, Troopers Dowling, Rondeau and Tanksley utilized open and closed hand and elbow strike techniques consistent with their training to apprehend plaintiff. On this record, the Court finds that defendants used the amount of force reasonable to effectuate the arrest of Mr. Irizarry.

Finally, the Court does not find that plaintiff has proven by a preponderance of the evidence that Sergeant Ericson used force against him. The Court credits the testimony of Troopers Dowling, Rondeau and Tanksley. Further, for the reasons stated, the Court finds that Sergeant Ericson did not fail to intervene

to stop the other officers from using excessive force. As stated, the credible evidence shows that once the officers were able to subdue and place plaintiff into handcuffs, he was escorted from the woods and placed in a cruiser for transport to Troop D. Plaintiff's testimony about his alleged injuries is not consistent with the dispatch records, or medical evidence.

Accordingly, the Court finds in favor of defendants Dowling, Rondeau, Tanksley and Ericson on plaintiff's Fourth Amendment claim of excessive force.

## III. DELAY IN PROVIDING MEDICAL ASSISTANCE

The Court interprets plaintiff's complaint as bringing a §1983 claim alleging an unconstitutional delay in providing access to medical care against Sergeant Ericson. There is no dispute that plaintiff received medical care. Rather, plaintiff alleges that after he was transported to State Police Headquarters in Danielson, Connecticut, defendant Ericson denied him medical care for "nearly three hours" although he was "bleeding heavily and in obvious pain." [Compl. ¶¶10, 12]. Plaintiff was arraigned on May 13, 2013 after he received medical care for his facial wound. [3]

---

[3] It is undisputed that plaintiff was arraigned on May 13, 2013, after he received medical attention at the hospital. [7/10/18 Tr. 5].

The parties agree that before an arrestee is arraigned and is still in the custody of the police, the Fourth Amendment applies. [7/10/18 Tr. 4-5]; see Shakir v. Derby Police Department, 284 F. Supp. 3d 165, 207-08 (D. Conn. 2018)(applying the Fourth Amendment standard to pre-arraignment denial of medical treatment claims (citing Powell v. Gardner, 891 F.2d 1039 (2d Cir. 1989)); Burks v. Perrotta, No. 13-CV-5879 (ER), 2015 WL 2340641 (S.D.N.Y May 15, 2015) (applying 4th A to arrestee).

> Under the Fourth Amendment standard, the court must decide "whether the asserted denial of medical treatment was objectively unreasonable 'focusing on the circumstances confronting the police at the time of the arrest without regard to their underlying motives or attitude towards the suspect [.]' "Freece v. Young, 756 F. Supp. 699, 701 (W.D.N.Y. 1991) (quoting Miller v. Lovett, 879 F.2d 1066, 1070 (2d Cir. 1989)).

Burks, 2015 WL 2340641, at *8 [4].

---

[4] In contrast, denial of medical care claims that arise under the Fourteenth and Eighth Amendments are subject to the deliberate indifference standard. See Caiozzo v. Koreman, 581 F.3d 63, 69-72 (2d Cir. 2009). The deliberate indifference analysis contains both objective and subjective prongs. See Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994). This means that the plaintiff must not only show that the alleged deprivation was "sufficiently serious," id. (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991)), he must also demonstrate that "the charged official ... act[ed] with a sufficiently culpable state of mind." Id. (citing Wilson, 501 U.S. at 298).

Burks, 2015 WL 2340641, at *8 n.17.

In Burks v. Perrotta the court

> identified four factors that are relevant to assessing
> the objective reasonableness of an officer's conduct
> in the denial of medical care context: (1) whether the
> officer had notice of the arrestee's medical need "by
> word ... or through observation of the arrestee's
> physical symptoms[;]" (2) the seriousness of the
> medical need; (3) the scope of the requested
> treatment; and (4) law enforcement's interests,
> including administrative, penological, or
> investigatory concerns.

Id. (quoting Williams v. Rodriguez, 509 F.3d 392, 403 (7th Cir.

2007) (internal citations omitted)).

Applying the first factor set forth in Burke, it is

undisputed that Sergeant Ericson observed Irizarry's facial

injury. He testified that once plaintiff was placed in

handcuffs, Ericson could see that Irizarry was bleeding from a

laceration on his forehead. [7/10/18 Tr. 241]. Second, Ericson

considered the seriousness of plaintiff's medical condition.

Ericson testified that

> Mr. Irizarry was not in need of immediate medical
> attention. He had a laceration to his face that was
> not bleeding profusely. He was breathing properly. He
> was not in cardiac arrest or any kind of breathing
> difficulty. He did not sustain a loss of blood. So he
> was not in dire need of medical attention.

[7/11/18 Tr. 13]. The Court credits the photographic evidence,

EMT records, hospital treatment records and Sergeant Ericson's

testimony that, at that time of the injury, his assessment that

Irizarry's injury did not require immediate medical attention

was objectively reasonable. [7/10/18 Tr. 241, 252; Pl. Ex. 1].

"[T]he Fourth Amendment's reasonableness analysis operates on a sliding scale, balancing the seriousness of the medical need with the third factor—the scope of the requested treatment." Williams, 509 F.3d at 403. Here, the medical records show that Irizarry did not require pain medication, he received a local anesthetic and the lacerations were closed by the doctor at bedside without surgery. [Pl. Ex. 1]. The wound was described as "moderate." Id. The treatment records noted a 3 cm laceration over the eyebrow and a 4 cm between the eyebrows that required 16 stitches. Id. Ice was provided as a comfort measure. Id. His speech was clear, he was awake, alert and oriented in place and time. No respiratory or neurological deficits were noted. Id. The doctor noted no tenderness, bruising, or masses to the abdomen. Id. A CT scan of plaintiff's head was "negative for bleed or traumatic brain injury." Id. Irizarry was discharged from care without pain medication. The only follow-up care noted was to remove sutures within five days. Id.

Ericson determined on the scene, based on his assessment of injuries to Irizarry, Dowling, and Tanksley, that Trooper Dowling would be transported by ambulance for medical treatment, while Irizarry would be transported by Trooper Tanksley to the

barracks for processing.[5] It was objectively reasonable for
Ericson to triage the injuries to allocate limited emergency
medical resources.

Finally, "police interests" factor into the reasonableness
determination. Id. Here, Ericson testified that he had limited
emergency medical resources and limited personnel available to
respond to the incident. Two ambulance companies cover this
rural area of fourteen towns served by Troop D. One ambulance
was assigned to Dunkin' Donuts to decontaminate people exposed
to the pepper spray, while the other ambulance transported
Trooper Dowling with a broken hand to the hospital. [7/11/18 Tr.
12]. Moreover, Ericson explained he had six patrol officers on
the evening shift to cover a fourteen town area. [7/11/18 Tr.
14]. After the incident, Troopers Dowling was accompanied by
Trooper Brink to the hospital; Trooper Tanksley transported
Irizarry to the barracks for processing; and Trooper Rondeau and
the remaining troopers, except for one, were sent to the Dunkin'
Donuts to take statements and photographs and seize evidence.
The Court finds that it was objectively reasonable, in light of
police interests, for Ericson to allocate limited emergency
medical and administrative resources in this manner, and assign

---

[5] Trooper Tanksley did not receive medical treatment for his
sprained wrist until after ten o'clock when he was transported
to the hospital by Trooper Brink. [7/10/18 Tr. 227-28].

remaining personnel to secure the scene and investigate the incident.

For these reasons, the Court also finds that the delay in providing medical care did not rise to a Fourth Amendment violation. It is undisputed that plaintiff was eventually taken to the hospital. [Pl. Ex. 1].

> The Second Circuit has instructed courts to "focus on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone in analyzing whether the alleged deprivation is, in objective terms, sufficiently serious[.]" Bilal v. White, 494 F. App'x 143, 145 (2d Cir. 2012) (quoting Smith v. Carpenter, 316 F.3d 178, 185 (2d Cir. 2003)) (internal quotation marks omitted) (emphases in original). Under this analysis, "it's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant[.]" Smith, 316 F.3d at 186. The "actual medical consequences that flow from the alleged denial of care" are considered "highly relevant to the question of whether the denial [or delay] of treatment subjected the prisoner to a significant risk of serious harm." Id. at 187.

Burks, 2015 WL 2340641, at *9 (finding instructive in a Fourth Amendment case "[t]he line of cases involving the objective prong of Eighth Amendment delay in medical cases[.]").

After Irizarry was transported to the barracks, he did not see Sergeant Ericson for approximately two to three hours. Upon his return to the barracks, Ericson visited plaintiff in the lockup, ascertained that he wanted medical attention, requested an ambulance and ordered Irizarry transported to the hospital.

Plaintiff testified that during the delay he experienced excessive bleeding and extreme pain. [7/10/18 Tr. 33-34]. He stated that the sole lasting physical effect from his injuries is facial scarring. [7/10/18 Tr. 37]. He also claims lasting psychological and emotional effects as he no longer trusts or likes law enforcement officers. [7/10/18 Tr. 37]. However, plaintiff's testimony regarding excessive blood loss and excessive pain is not consistent with the EMS records or the hospital intake and treatment records. [Pl. Ex. 1]. EMS records state that plaintiff was conscious and alert and all motor and sensory neurological examination were normal. Id. Clinical physical findings described a laceration over the left eye with swelling, pain, and bleeding. Id. Hospital treatment records state that the doctor sutured Irizarry at bedside with only a local anesthetic and without pain medication. Blood loss did not require transfusion. Id. Symptoms were described as "moderate." Id. He was conscious and oriented on admission. Respiration was normal, and no neurological deficits were noted. Id. No "emergency protocols" were activated. Discharge instructions were routine. Id. Indeed, plaintiff testified on cross-examination that the medical records do not note bleeding because "[a]t that point I stopped bleeding." [7/10/18 Tr. 63]. It is not sufficient for the plaintiff to allege that he suffered from a medical condition, by itself; rather, he must

show that the delay in provision of medical services was "objectively serious." Villafane v. Sposato, 2017 WL 4179855, *20 (E.D.N.Y. Aug. 22, 2017). In considering the "objective" component in Eighth Amendment claim for delay in providing medical care, the Second Circuit has instructed courts to "focus on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone in analyzing whether the alleged deprivation is, in objective terms, sufficiently serious." Bilal v. White, 494 F. App'x 143, 145 (2d Cir. 2012)(emphasis in original); see Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998)("Other circuits have held a serious medical condition existed where the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.")(internal quotation marks and citation omitted)); Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1188-89 (11th Cir. 1994) (explaining that the seriousness of a delay in medical treatment "may be decided by reference to the effect of delay in treatment.... [c]onsequently, delay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for delay") (emphasis in original)). The "actual medical consequences that flow from the alleged denial of care" are considered "highly relevant to the question

of whether the denial [or delay] of treatment subjected the prisoner to a significant risk of serious harm." Smith v Carpenter, 316 F.3d 178, 187 (2d Cir. 2003). "As we noted in Chance, it's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes." Id. (citing Chance, 143 F.3d at 702-03)); compare Jesionowski v. Beck, 937 F. Supp. 95, 103 (D. Mass. 1996)("There is a dearth of evidence to show that Jesionowski's [laceration on his forehead] was exacerbated in any manner by the [thirty minute] delay, or that the delay of treatment caused any permanent damage to him, or that his end medical result was at all implicated by the actions of the defendant police officers. At worst, he may have lost more blood than he would have had treatment been provided more promptly, but again, there is nothing to show what, if any, effect this may have had on him."), and Ocasio v. Green, No. 8-CV-0018, 2009 WL 3698382, *4 (N.D.N.Y. Nov. 2, 2009)(finding fractured third metacarpal does not rise to a "serious medical condition" and plaintiff did not show that a two day delay to perform x-ray caused "any further harm or injury."), with Hathaway v. Coughlin, 37 F.3d 63, 68-69 (2d Cir. 1994)(finding delay of two years to perform corrective surgery on a degenerative hip condition violated Eighth Amendment); see Hill,

40 F.3d at 1189 (comparing Aldridge v. Montgomery, 753 F.2d 970, 971 (11th Cir. 1985 (directed verdict inappropriate for county jail officials who ignored bleeding cut over eye for two and a half hours, although there was "a pool of blood on the floor approximately the size of two hands" and blood on the inmate's shirt and coat) with Martin v. Gentile, 849 F.2d 863, 871 (4th Cir.1988) (no Eighth Amendment violation for fourteen-hour delay in treatment of cut over eye because bleeding had stopped and delay did not exacerbate the injury)).

Based on the evidence, plaintiff has not shown any medical consequence that flowed from the two to three hour delay in the provision of medical care or that the delay subjected him to risk of serious harm. His pain was not treated with medication. Blood loss did not require a transfusion and plaintiff testified that the bleeding stopped by the time he arrived at the hospital. The lacerations were sutured and although there is residual scarring, it is not a consequence of the delay in care. Similarly, the Court does not find that his psychological and emotional distress toward law enforcement officers is a consequence of the delay in medical care.

The Court finds that plaintiff has not shown that the delay in medical care rose to a Fourth Amendment violation. Accordingly, the Court finds in favor of defendant Ericson on this Fourth Amendment claim for delay in providing medical care.

IV.  CONCLUSION

Based on the foregoing, the Court enters judgment in favor of defendants Michael Dowling, Andrew Rondeau, Ethan Tanksley and Heath Ericson on plaintiff's 42 U.S.C. §1983 claims of excessive force and delay in providing medical care in violation of the Fourth Amendment.[6]

Defendant's oral Motion for Judgment as a Matter of Law pursuant to Federal Rule of Civil Procedure 50 is **DENIED** as **MOOT** in light of the Court's ruling entering judgment in favor of all defendants.

SO ORDERED at Bridgeport, Connecticut this 26th day of September 2018.

                          _____/s/_____
                          HOLLY B. FITZSIMMONS
                          UNITED STATES MAGISTRATE JUDGE

---

[6] This is not a Recommended Ruling. The parties consented to proceed before a United States Magistrate Judge [doc. #34] on January 10, 2017, with appeal to the Court of Appeals. Fed. R. Civ. P. 73(b)-(c).